# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

DEAN STREET CAPITAL ADVISORS, LLC,

        Plaintiff,

v.

        **MEMORANDUM OF LAW & ORDER**
        Civil File No. 17-1781 (MJD/BRT)

OTOKA ENERGY, LLC, <u>et al.</u>,

        Defendants.

Arthur G. Boylan and Norman H. Pentelovitch, Anthony Ostlund Baer & Louwagie P.A. , Counsel for Plaintiff Dean Street Capital Advisors, LLC.

Andrew J. Pieper, Eric A. Bartsch, and Margaret E. Dalton, Stoel Rives LLP, Counsel for Defendants Otoka Energy, LLC; Buena Vista Biomass Development, LLC; Buena Vista Biomass Power, LLC; and Amador Biomass, LLC.

Brooks F. Poley, Winthrop & Weinstine, PA, and Sean T. Carnathan and Joseph P. Calandrelli, O'Connor, Carnathan and Mack, LLC , Counsel for Defendants State Street Bank and Trust Company and Antrim Corporation.

## I.    INTRODUCTION

This matter is before the Court on the State Street Defendants' Motion for

Summary Judgment [Docket No. 90] and the Otoka Defendants' Motion for

Summary Judgment [Docket No. 100].  The Court heard oral argument on

January 30, 2019.  For the reasons that follow, the Court grants the State Street

Defendants' motion and grants in part and denies in part the Otoka Defendants' motion.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    The Original Purchase of the Plant

In 2004, Mark Thompson formed a single-member LLC, Strategic Energy Concepts, LLC ("Strategic Energy"), for the purpose of investing in and advising the development of renewable energy projects.  (Dalton Decl., Ex. 1, Thompson Dep. 22-24.)

In 2006, Strategic Energy learned of an opportunity to acquire an idle lignite (brown coal) power plant in Ione, California (the "Plant") and convert it to a biomass power plant.  (Thompson Dep. 23-25, 40, 43-46.)  Strategic Energy entered into an agreement to buy the Plant and to lease the land under it.  (Id. 45-46.)  Thompson set up Defendant Buena Vista Biomass Power, LLC ("BVBP") to hold the Plant assets.  (Id. 46.)

Defendant Otoka Energy, LLC ("Otoka") is a small renewable energy development company.  (Dalton Decl., Ex. 3, Muston Dep. 21-22; Dalton Decl., Ex. 4, Broin Dep. 30-31.)  Michael Muston is Otoka's President and CEO.

(Muston Dep. 16, 21.)  Robert Broin is one of Otoka's largest shareholders. (Muston Dep. 21; Broin Dep. 30-32.)

Strategic Energy needed additional capital to close the deal to buy the Plant.  (Thompson Dep. 60-61.)  Otoka entered into the transaction, and the sale closed.  (Id. 48.)  In order to complete the purchase, in 2009, Otoka and Strategic Energy created Defendant Buena Vista Biomass Development, LLC ("BVBD") to own 100% of the shares of BVBP.  (Thompson Dep. 47; Dalton Decl., Ex. 11, 2009 Membership Interest Purchase and Sale Agreement.)  Otoka invested in BVBD and received a 2/3 interest in BVBD, and Strategic Energy owned the remaining 1/3 of BVBD.  (Thompson Dep. 48-49, 60-61; Dalton Decl., Ex. 2, Berk Dep. 149; Dalton Decl., Ex. 11, 2009 Membership Interest Purchase and Sale Agreement at ¶¶ 2.01, 2.06, and Ex. B.)  Thus, when the transaction closed, Otoka and Strategic Energy owned BVBD, BVBD owned BVBP, and BVBP owned the Plant.

### 2.    The PPA

The State of California requires that a certain percentage of all electrical power generated in the state come from sources other than fossil fuels, and utility companies must contract for the purchase of electricity from a "renewable electrical generation facility," such as the Plant.  Cal Pub. Util. Code §§ 399.11-

399.12.  Before Otoka became involved in BVBD, Strategic Energy had already

negotiated and finalized a long-term power purchase agreement with the

Sacramento Municipal Utility District ("SMUD").  (Thompson Dep. 52-53, 74-75.)

In November 2009, BVBP entered into a Renewable Power Purchase Agreement

with SMUD ("PPA"), under which SMUD would purchase electricity from

BVBP.  (Id. 52-53, 74-75.) The PPA required that the Plant reach "Commercial

Operation" by July 1, 2012; SMUD had the power to unilaterally terminate the

PPA if Commercial Operation was not met by July 1, 2012.  (Thompson Dep. 115-

16, 118, 120-21; Dalton Decl., Sealed Ex. 29.)

### 3.  Development of the Plant through 2012

Dean Street Capital Advisors, LLC ("Dean Street") is a single-member LLC

formed by Noam Berk in 2008 for the purpose of consulting on financial

transactions in the energy field.  (Berk Dep. 13.)  Berk and Thompson had

become friends in 2005 when they were both working on the same energy

transaction.  (Id. 15-16, 19, 108.)  Dean Street became involved in the Plant project

in late 2008.  (Id. 24-25.)

Dean Street worked with Strategic Energy to obtain a $19 million bridge

loan from Macquarie Bank to BVBD to begin retrofitting construction of the

Plant. (Thompson Dep. 59-60; Berk Dep. 25-26.) Berk viewed his work on the Macquarie loan as helping Thompson personally, Berk did not expect payment for his work, and Thompson did not pay Berk for his introductions and advice. (Berk Dep. 26-27, 32-33.) By 2012, the Plant was near operational status, but was still not operating, had no revenue, and had outstanding financial obligations, including the $19 million construction loan from Macquarie. (Thompson Dep. 68; Berk Dep. 27-30.)

In early 2012, Dean Street introduced Muston and Thompson to Santosh Raikar, a president of Defendant Antrim Corporation ("Antrim") and a managing director of Defendant State Street Bank and Trust Company ("State Street"), as a potential tax equity investor. (Berk Dep. 28; Dalton Decl., Ex. 5, Raikar Dep. 23, 25.) Antrim was an affiliate of State Street created to be a vehicle for tax equity investments; Antrim was not a substantive entity in its own right and had very little capital. (Raikar Dep. 12, 14-15.)

In May or June 2012, after Berk had introduced Thompson and Muston to State Street, Muston and Berk had a telephone conversation in which, for the first time, they talked about a fee to Dean Street for introducing State Street to Strategic Energy and Otoka. (Muston Dep. 208-09; Berk Dep. 33-36, 145.)

Berk recalls the conversation as follows:

> I don't recall the conversation specifically. I know we discussed the amount, and I know it ended up being $200,000. I don't remember the exact details of the conversation and how that number was agreed on. It's not a – it's a very standard number for a transaction of this size.

(Berk Dep. 37.)

Muston recalls the conversation as follows:

> I agreed to pay Dean Street Capital, Noam Berk, 200,000 out of the State Street proceeds.

> * * *

> [Berk] said, I believe I should be entitled to a fee. He presented the 200,000 as his – what he thought was fair. And I said, well, if we get, you know, 200,000 out of the proceeds from this – from this tax equity financing, I would support that.

(Muston Dep. 13, 209.)

### 4. The Tax Equity Transaction

#### a) Negotiations for the Tax Equity Transaction

The parties agreed to a multi-step and multi-contract tax equity transaction ("Tax Equity Transaction") in which the $19 million construction debt would be recapitalized with equity; Strategic Energy would sell its shares and exit the business; and Otoka would continue as an owner of a new entity holding

ownership of the Plant but would share that role with the tax equity investor, Antrim. (Thompson Dep. 84-85.) Antrim would invest $35 million in three payments: $25 million at closing and two $5 million installment payments ("Installment Payments") payable at later dates.

Initially, up through the evening of June 28, 2012, Dean Street's $200,000 fee was scheduled to be paid out of the initial $25 million payment. (See Berk Dep. 91-94; Dalton Decl., Ex. 17, June 28, 2012 Email Attaching Draft Settlement Statement, at P070683.) Later in the evening on June 28, Strategic Energy or its attorney called Berk and told him that there were other project costs that needed to be paid out of the first $25 million and, so, Dean Street's $200,000 fee would be moved until the first $5 million Installment Payment on or about July 30, 2012. (Berk Dep. 75-78.) Berk "was told that the expectation was that the monies would be available when more money was coming into the project. The next money to – expected to come into the project was . . . the first installment," but "there was no conditioning or any sort that said it had to be the money that came in." (Id. 77.) Dean Street "had no problem deferring the payment" and agreed to wait, and, so, on June 29, the $200,000 fee was removed from the list of creditor payments to be paid out of the $25 million closing payment. (Berk Dep. 74-78,

94-97; Dalton Decl., Exs. 18-19.)  The BVBP reserves were raised from approximately $700,000 to $1.9 million in the final days before the Tax Equity Transaction closed because of the Plant's last-minute commercial operation problems and an unexpected surge in payables.  (Raikar Dep. 80-84, 221-22.)

### b)    The MIPA

On June 26, 2012, Strategic Energy, BVBD, and Otoka entered into the Membership Interest Purchase Agreement ("MIPA").  (Dalton Decl., Ex. 6, MIPA.)  Under the MIPA, Otoka purchased Strategic Energy's 1/3 membership interest in BVBD, and Otoka became the 100% owner of BVBD.  (MIPA ¶ 1.1.)

### c)    Extension of the SMUD Deadline

On June 27, 2012, the parties learned for the first time that SMUD would not certify the Plant as commercially operational by July 1, 2012.  (Raikar Dep. 225-26; Muston Dep. 84-85; Dalton Decl., Ex. 30.)

The PPA gave SMUD the power to unilaterally terminate the PPA based on BVBP's failure to achieve Commercial Operation by July 1, 2012.  (Dalton Decl., Sealed Ex. 29.)  On June 28, Otoka secured an extension of the Commercial Operation deadline from SMUD to August 1, 2012.  (Id.)

### d)    The ECCA

On June 28, 2012, pursuant to the terms of the Membership Interest

Purchase and Equity Capital Contribution Agreement among Otoka, Antrim,

and Defendant Amador Biomass, LLC ("Amador") ("ECCA") (Dalton Decl., Ex.

7), Antrim invested $25 million into Amador, an entity created to own the

operating company that held the Plant assets.  (Thompson Dep. 161-62.)  Otoka

held 100% of Amador's Class A membership, and Antrim owned 100% of

Amador's Class B membership.  (Id.; ECCA at p.1)

Overall, Antrim agreed to pay $35 million for all of the Class B

membership interests in Amador in three payments: $25 million at closing and

two $5 million Installment Payments payable after the Plant achieved

Commercial Operation.  (ECCA at pp. 3, 6, 13 and §§ 2.1, 6.2, 6.3.)

The ECCA provided that Antrim was required to make the Installment

Payments conditioned on the Plant meeting certain milestones ("Funding

Conditions").  (ECCA §§ 6.2, 6.3.)  The Funding Conditions included that the

Plant achieve Commercial Operation on or before July 31, 2012 and that SMUD

confirm Commercial Operation.  (ECCA § 6.2; ECCA Definitions at 11.)

Specifically, the ECCA stated:

> In addition to the conditions set forth in Section 6.1, the
> obligations of the Class B Investor [Antrim] to make the First

Installment Capital Contribution are subject to the satisfaction or waiver (by [Antrim]) of each of the following conditions by no later than July 31, 2012:

      (a) Not later than five (5) Business Days before the First Installment Funding Date, the Company shall cause [BVBP] to deliver to the Equity Investors a summary of the statistical data relating to the Capacity Test;

      (b) [BVBP] (A) shall have delivered a notice of "Commercial Operation" with respect to the Project as set forth in Sections 2.2 and 2.3.1 of the Power Purchase Agreement, and (B) shall have notified the Power Purchaser under the Power Purchase Agreement that the "Commercial Operation Date" (as defined in the Power Purchase Agreement) has been achieved and shall have included in such notice evidence of the satisfaction or occurrence of all of the conditions set forth in Section 3.3.1 of the Power Purchase Agreement, and (ii) the Power Purchaser shall have confirmed that the "Commercial Operation Date" (as such term is defined in the Power Purchase Agreement) shall have been deemed to have occurred in accordance with Section 2.2 and 2.3.1 of the Power Purchase Agreement;

      * * *

(ECCA ¶ 6.2(a)-(b).)

      The ECCA contained a Project Budget, which provided how Amador was going to use the $35 million payments. (ECCA at Annex 12-A.) The first $25 million payment was to be used to retire the $19 million Macquarie loan and pay off any other lienable project development and certain Tax Equity Transaction costs outstanding at the time of the Tax Equity Transaction closing. (Id.) The

first $5 million Installment Payment was to be used to pay Dean Street's $200,000

and other outstanding project development and Tax Equity Transaction costs.

(Id.)  The second $5 million payment was reserved.  (Id.)

Section 3.19 of the ECCA provides:

**Brokers.**  Except as set forth on Schedule 3.19, No broker, finder,
investment banker, or other person is entitled to any brokerage,
finder's or other fee or commission in connection with the
transactions contemplated under this Agreement or any Transaction
Document based upon arrangements made by the Company
[Amador] or the Project Company [BVBP] for which the [Amador],
[BVBP], or the Class B Investor [Antrim] will be responsible.

(ECCA § 3.19.)

Schedule 3.19 provides:

Under the terms of a verbal commitment by Buena Vista Biomass
Development, LLC, Dean Street is entitled to receive $200,000 upon
the closing of (1) the Purchase and Sale Agreement by and between
Amador Biomass, LLC and Buena Vista Biomass Development, LLC
and (2) the Membership Interest Purchase and Equity Capital
Contribution Agreement among Otoka Energy Corporation,
Amador Biomass, LLC and Antrim Corporation.

(Dalton Decl., Ex. 16, Schedule 3.19.)

The ECCA further provides:

The Transaction Documents, the exhibits and schedules hereto, and
the other documents executed and delivered on Closing Date,
contain the entire agreement between the Parties hereto with respect
to the Transaction, and shall supersede all previous oral and written

11

> and all contemporaneous oral negotiations, commitments, and
> understandings, and all other letters, memoranda or other
> documents or communications, whether oral, written or electronic,
> in connection with the negotiation and execution of this Agreement.

(ECCA § 10.4.)

The ECCA also contains a paragraph that limits assignment of the rights

and obligations under the ECCA and states:

> Nothing in this Agreement will confer upon any person or entity not
> a party to this Agreement, or the legal representatives of such
> person or entity, any rights or remedies of any nature or kind
> whatsoever under or by reason of this Agreement.

(ECCA § 10.12.)

### e) The PSA

On June 28, 2012, Amador used the money that it received from Antrim to

buy 100% of BVBP from BVBD. Amador's purchase was made under the terms

of the June 28, 2012, Purchase and Sale Agreement by and between Amador

Biomass, LLC as Purchaser and Buena Vista Biomass Development, LLC as Seller

("PSA"). (Dalton Decl., Ex. 8.)

The PSA provides:

> **Brokers.** Except as set forth in <u>Section 3.19</u> of the <u>Seller Disclosure</u>
> <u>Schedule</u>, no broker, finder, investment banker, or other person is
> entitled to any brokerage, finder's or other fee or commission in
> connection with the transactions contemplated under this

Agreement based upon arrangements made by Seller [BVBD] or the Company [BVBP] for which [BVBD], [BVBP], or the Purchaser [Amador] will be responsible.

(PSA § 3.19.)

The PSA provides that it "supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof, and contains the sole and entire agreement between the parties hereto with respect to the subject matter hereof." (PSA §§ 11.01.) It further provides:

Except as provided hereinbelow, the terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person other than any Person entitled to indemnity under Article IX; *provided, however*, that the Seller acknowledges that the Class B Investor may enforce any rights available to the Purchaser hereunder.

(PSI § 11.12.)

At the close of the Tax Equity Transaction, State Street owned Antrim, which owned 100% of the Class B Membership of Amador. Otoka owned 100% of the Class A Membership of Amador. Amador owned 100% of BVBP, and BVBP owned the Plant. (Dalton Decl., Ex. 13.)

### 5. Dean Street's Demand for Payment

On June 28, 2012, Berk sent an invoice for his $200,000 fee to the escrow

agent. (Carnathan Aff., Sealed Ex. D.) The invoice was addressed to BVBD,

"Attention Messrs. Mike Muston and Mark Thompson." (Id.)

On August 5, 2013, Berk sent a demand letter attaching the same invoice.

(Carnathan Aff., Sealed Ex. D.) The letter is addressed to:

> Mike Muston
> BUENA VISTA BIOMASS POWER, LLC
> BUENA VISTA BIOMASS DEVELOPMENT, LLC
> c/o OTOKA ENERGY CORPORATION

The demand letter states that BVBP and BVBD owe the $200,000 fee to Dean

Street. (Id.)

As of today, Dean Street has not been paid the $200,000 fee. (Muston Dep.

129-30.)

### 6. Plant Operations after the Tax Equity Transaction

After the Tax Equity Transaction closed, the Plant suffered serious

operational problems. (Broin Dep. 110-14.) Otoka attempted to solve the

problems and achieve Commercial Operation by the July 31, 2012, deadline, but

it failed. (Broin Dep. 114-19.) Because the Plant did not achieve Commercial

Operation on or before July 31, 2012, State Street decided not to make the two $5

million Installment Payments to Amador at the end of July and August 2012. (Raikar Dep. 246-47, 258-59.)

The Plant's operational problems continued into the fall of 2012. (See, e.g., Dalton Decl., Exs. 36-37.) In September 2012, Otoka asked State Street to pay $500,000 of the first Installment Payment to Amador, but State Street declined because the Plant had not achieved Commercial Operation. (Raikar Dep. 276-77; Dalton Decl., Ex. 41.) By September 2012, the Plant had consumed all of the cash that had been reserved for operations and repairs at the time of the Tax Equity Transaction closing, and Otoka invested an additional $1.4 million into Amador as a capital contribution to fund operations. (Raikar Dep. 94-97; Dalton Decl., Sealed Ex. 46.)

In October 2012, Muston, Broin, Berk, Raikar, and others met to discuss how to fund further repairs and operations. (Dalton Decl., Sealed Ex. 44.) At that time, the Plant had still not achieved Commercial Operation. Amador was almost out of cash to fund operations, there were millions in accounts payable, and the Plant needed a $2.1 million repair to the cyclone to solve a design problem that was causing serious problems. (Id.; Broin Dep. 111-13, 123-26.) In order to make the repairs, Otoka would need to close the Plant for most of

November 2012 and would need to ask SMUD for more concessions.  (Dalton

Decl., Sealed Ex. 44; Broin Dep. 111-13, 123-26.)

Otoka asked State Street to loan BVBP $5 million in the form of senior

secured debt, but State Street would not agree.  (Berk Dep. 187-88; Dalton Decl.,

Sealed Ex. 44.)  Berk suggested allowing BVBP to raise up to $10 million in

secured debt.  (Berk Dep. 134-35.)  Otoka agreed to loan Amador $10 million.

(Dalton Decl., Ex. 9, November 2, 2012 Member Loan Agreement ("November

Member Loan Agreement").)  Immediately after the meeting, Berk informed

Thompson of what happened at the October 19 meeting.  (Dalton Decl., Ex. 47.)

Berk considered the plan to be a "net benefit" to the project.  (Berk Dep. 135.)

Antrim consented to the loan, and on November 2, 2012, Antrim and Otoka

entered into the November Member Loan Agreement, under which Otoka

loaned $10 million to Amador.

After a series of extensions of the Commercial Operation Deadline, the

Plant ultimately achieved Commercial Operation on October 24, 2012.  (Dalton

Decl., Sealed Ex. 38.)  In December 2012, after the Plant was "placed in service"

and began to operate continuously, Antrim applied for and received $19.6

million in investment tax credits.  (Raikar Dep. 133.)

On May 29, 2013, the Plant's boiler exploded, putting the Plant offline until September 23, 2013.  (Muston Dep. 239; Dalton Decl., Ex. 49.)  The Plant sold power to SMUD from September 23, 2013, until February 2016.  (Muston Dep. 239-40.)  However, the cost of operating the Plant and paying for capital projects exceeded the revenue being generated, and Otoka continued advancing millions of dollars to Amador.  (Id. 240-41.)  The Plant is now idled and only worth scrap value.  (Id. 196-98.)  State Street never made the two $5 million Installment Payments.  No cash was ever distributed to Antrim or Otoka.  (Id. 241.)

### B.    Procedural History

On May 26, 2017, Dean Street filed a Complaint against Otoka, BVBD, BVBP, and Amador (collectively, "Otoka Defendants") and State Street and Antrim (collectively, "State Street Defendants") in this Court.  [Docket No. 1] The Complaint asserts the following counts: Count 1: Breach of Contract (All Defendants); Count 2: Breach of Covenant of Good Faith and Fair Dealing (All Defendants); Count 3: Quantum Meruit (Contract Implied in Fact) (All Defendants); Count 4: Unjust Enrichment (Contract Implied in Law) (All Defendants); Count 5: Promissory Estoppel (All Defendants); and Count 6: Account Stated (All Defendants).

Defendants now move for summary judgment on all claims against them.

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. Celotex, 477 U.S. at 323. "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

### B.   Choice of Law

Plaintiff and the Otoka Defendants all agree that Minnesota law applies to Plaintiff's claims against the Otoka Defendants. However, the State Street Defendants assert that New York law applies to all claims against them, while Plaintiff asserts that Minnesota law applies.

"Federal courts sitting in diversity apply the choice-of-law rules of the forum state." H&R Block Tax Servs. LLC v. Franklin, 691 F.3d 941, 943 (8th Cir.

2012) (citation omitted).  Under Minnesota law, "[b]efore a choice-of-law analysis can be applied, a court must determine that a conflict exists between the laws of two forums.  A conflict exists if the choice of one forum's law over the other will determine the outcome of the case."  Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co., 604 N.W.2d 91, 93–94 (Minn. 2000) (citations and footnotes omitted).

The Court concludes that the choice of law between Minnesota and New York is not outcome-determinative in this case.  As applicable to the claims against the State Street Defendants in this case, Minnesota and New York law are the same with regard to breach of contract, breach of the covenant of good faith and fair dealing, quantum meruit, unjust enrichment, promissory estoppel, and account stated.  New York and Minnesota law do differ with regard to the statute of frauds.  Compare Snyder v. Bronfman, 921 N.E.2d 567, 569 (N.Y. 2009) (holding that, under New York law, the statute of frauds applies to quantum meruit and unjust enrichment claims), with Roaderick v. Lull Eng'g Co., 208 N.W.2d 761, 764 (Minn. 1973) (holding that, under Minnesota law, quantum meruit claim survives even though statute of frauds excluded contract claim).  However, the Court concludes that all of the claims against the State Street

Defendants fail regardless of the applicability of the statute of frauds.  Therefore, the Court need not conduct a choice-of-law analysis.

### C.     Count 1: Breach of Contract (All Defendants)

#### 1.     Elements of Breach of Contract Claim

"The elements of a breach of contract claim are (1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co., 848 N.W.2d 539, 543 (Minn. 2014) (citation omitted).

"A condition precedent [] is any fact or event, subsequent to the making of a contract, which must exist or occur before a duty of immediate performance arises under the contract."  Nat'l City Bank v. St. Paul Fire & Marine Ins. Co., 447 N.W.2d 171, 176 (Minn. 1989) (citation omitted).  "[U]nfulfilled conditions prevent enforcement of a contract."  Crossroads Church of Prior Lake Minnesota v. County of Dakota, 800 N.W.2d 608, 615 (Minn. 2011).

> [A] breach of contract does not occur when a contract is conditioned on third-party approval and the approval is not received.  If the event required by the condition does not occur, there can be no breach of contract, since the contract is unenforceable.

Nat'l Union Fire Ins. v. Schwing Am., Inc., 446 N.W.2d 410, 412 (Minn. Ct. App. 1989) (citation omitted).

### 2. Breach of Contract Against Otoka Defendants

The Court denies summary judgment as to the breach of contract claim against BVBD, Amador and Otoka because there is a question of fact regarding whether Berk and Muston agreed that Dean Street's payment would only be paid out of the first Installment Payment. The Court grants summary judgment as to the claim against BVBP.

### a) BVBD, Amador and Otoka

There is no dispute that BVBD and Dean Street entered into a verbal commitment under which Dean Street was entitled to receive $200,000 at the close of the Tax Equity Transaction. The parties agree that the payment was originally scheduled to be made out of the first $25 million closing payment. It is agreed that, at the last minute, Berk agreed that it was "fine" to defer the timing of Dean Street's payment. (Berk Dep. 75-77.) There is also no dispute that State Street never made the Installment Payments. However, the parties disagree regarding whether Dean Street agreed that payment of the first Installment Payment would be a condition precedent to its $200,000 payment.

There are no documents or unequivocal evidence that show that Plaintiff agreed to condition its $200,000 fee on the payment of the Installment Payments. Schedule 3.19 provides that Dean Street's payment is conditioned "upon the closing of (1) the [PSA] and (2) the [ECCA]." It is undisputed that those contracts closed. Schedule 3.19 does not mention the Installment Payments. Berk testified that he "never had any discussion on any contingents, contingency related to the payment for Dean Street." (Berk Dep. 115.) None of the Tax Equity Transaction documents state that Dean Street's right to payment is contingent on the Installment Payments. Berk's testimony alone is sufficient to raise a fact question when the contract at issue is oral, there is no contradictory written document, and his testimony does not contradict any previous sworn statement by him.

There is conflicting deposition testimony as to the terms of the agreement to pay Dean Street, and the Court cannot grant summary judgment when material facts are in dispute. See Jansen v. Herman, 230 N.W.2d 460, 464 (Minn. 1975) ("Whether or not a certain oral agreement constituted a condition precedent for a subsequent contract is a factual determination to be decided by the trier of fact.").

   **b)**  **BVBP**

The Court grants summary judgment to BVBP because there is no evidence that BVBP ever agreed to pay Dean Street $200,000. Schedule 3.19 to the ECCA references a verbal commitment between Dean Street and BVBD. Plaintiff points to no testimony or other evidence that BVBP obligated itself to make the $200,000 payment. Thus, the breach of contract claim against BVBP is dismissed.

**3.    Breach of Contract Against State Street Defendants**

      **a)    Existence of a Contract with the State Street Defendants**

Berk testified that no one from State Street or Antrim made any promise to Dean Street regarding payment of a fee in connection with the Tax Equity Transaction. (Berk Dep. 141-42.) Without an offer or acceptance, there is no contract. <u>See</u> <u>Commercial Assocs., Inc. v. Work Connection, Inc.</u>, 712 N.W.2d 772, 782 (Minn. Ct. App. 2006) ("The formation of a contract requires communication of a specific and definite offer, acceptance, and consideration.").

Sections 3.19 of the ECCA and PSA do not create an obligation that the State Street Defendants pay $200,000 to Dean Street. These provisions are representations and warranties by Amador and Otoka in the ECCA and by BVBD in the PSA. Neither is a contractual undertaking by Antrim, and State

Street is not a party to the ECCA or PSA.  Both the ECCA and the PSA contain integration clauses and provisions precluding third-party beneficiaries, and Dean Street is not a party to either contract.  (See ECCA §§ 10.4, 10.12; PSA §§ 11.01, 11.12.)  Thus, neither contract created any contractual rights for Dean Street against the State Street Defendants.

### b)    Agency Relationship

Dean Street claims that the State Street Defendants are liable for the Otoka Defendants' contractual debt to Dean Street because a principal-agent relationship existed.  The record is devoid of evidence that would support a finding that a principal-agent relationship existed.

"Agency is the fiduciary relationship that results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."  A. Gay Jenson Farms Co. v. Cargill, Inc., 309 N.W.2d 285, 290 (Minn. 1981) (citations omitted).

> To support a finding of agency, two elements must be satisfied. First, it must be shown that there is a manifestation by the principal that an agent act on behalf of the principal.  Second, it must be shown that the principal has a right of control over the agent for purposes of the undertaking.

Home Fed. Sav. Bank v. Blaine Hosp., LLC, No. A09-988, 2010 WL 1286822, at *5

(Minn. Ct. App. Apr. 6, 2010) (citing Teeman v. Jurek, 251 N.W.2d 698, 702

(Minn. 1977)).

Here, the State Street Defendants exercised their authority to approve or

disapprove additional debt based on how it would be allocated over Amador,

not Otoka or BVBD.  Otoka could take on debt and spend money however it saw

fit.  There is no evidence that either State Street Defendant ever prevented Otoka

from paying Dean Street or exercised any control over Otoka at all.  There is no

evidence that the State Street Defendants exerted pervasive control over Otoka or

BVBD's day-to-day operations.  Moreover, as the Minnesota Supreme Court

noted in A. Gay Jenson Farms Co. v. Cargill, Inc., a security holder may exercise

veto power over its debtor's business acts without becoming a principal.  309

N.W.2d 285, 291 (Minn. 1981).  In this case, Plaintiff has simply not pointed to

evidence approaching the type of involvement and control that Cargill exercised

over Warren.

   **D.     Count 2: Breach of Covenant of Good Faith and Fair Dealing (All
           Defendants)**

1. **Elements of Breach of the Implied Covenant of Good Faith and Fair Dealing**

> Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not "unjustifiably hinder" the other party's performance of the contract. Similarly, we have held that the party to a contract cannot take advantage of the failure of a condition precedent when the party itself has frustrated performance of that condition.

In re Hennepin County 1986 Recycling Bond Litig., 540 N.W.2d 494, 502 (Minn. 1995) (citations omitted).

> [T]he implied covenant of good faith and fair dealing does not limit [a party's] right to act in accordance with the bargained-for terms of the agreement. In contrast, the implied covenant of good faith and fair dealing governs the parties' performance and prohibits a party from failing to perform for the purpose of thwarting the other party's rights under the contract.

Cox v. Mortg. Elec. Registration Sys., Inc., 685 F.3d 663, 671 (8th Cir. 2012) (citations omitted). Furthermore, "under [] Minnesota [law] a cause of action for good faith and fair dealing cannot [] exist independent of the underlying breach of contract claim." Orthomet, Inc. v. A.B. Med., Inc., 990 F.2d 387, 392 (8th Cir. 1993).

Dean Street argues that it did not agree to any conditions to receiving its $200,000 payment, but even if a condition existed that the first Installment Payment needed to have been made, that condition failed due to Defendants'

26

bad faith restructuring of the Tax Equity Transaction.  It argues that, in the November Member Loan Agreement, Otoka agreed that, instead of the State Street Defendants making this first Installment Payment, Otoka would make a loan to the Plant, which prevented Dean Street from being paid out of the first Installment Payment.

### 2. BVBP and BVBD

Only Otoka and Amador entered into the November Member Loan Agreement with Antrim.  Neither BVBD nor BVBP entered into the November Member Loan Agreement.  Dean Street has not made any argument as to how BVBP or BVBD breached a duty of good faith and fair dealing.  Thus, the claim against them is dismissed.

### 3. Otoka and Amador

Plaintiff's entire claim against Otoka and Amador is based on the November Member Loan Agreement.  However, there is no evidence from which a reasonable factfinder could find that their actions with regard to the November Member Loan Agreement unjustifiably hindered Dean Street's right to be paid $200,000 or that they acted with bad faith for the purpose of avoiding their contractual obligation to pay Plaintiff.  The evidence shows that, in the fall of

2012, Otoka sought to induce the State Street Defendants to pay money into the project, but the State Street Defendants refused. (See, e.g., Dalton Decl., Ex. 31; Berk Dep. 187-88; Dalton Decl., Sealed Ex. 44; Muston Dep. 105.) The member loan from Otoka to Amador was Dean Street's idea and was made to keep the project afloat. (Berk Dep. 134-35; Dalton Ex. 45, October 12, 2012 Email from Berk to Muston.) Thus, Otoka agreed to lend $10 million of its own money to Amador to keep the Plant afloat. There is no evidence that this loan was made in lieu of the Installment Payments with the intent of allowing the State Street Defendants to avoid making the Installment Payments. Rather, at the time the November Member Loan Agreement was negotiated, the Plant had not met Commercial Operation so there was no argument that the State Street Defendants were obligated to make the Installment Payments. Berk was involved in and aware of the negotiations leading to and the details of the member loan and thought that the November loan was a "net benefit" to the project.

Furthermore, in order to prevent summary judgment, Dean Street "must establish bad faith by demonstrating that the adverse party has an ulterior motive for its refusal to perform a contractual duty." OmegaGenesis Corp. v.

<u>Mayo Found. for Med. Educ. & Research</u>, 132 F. Supp. 3d 1119, 1127 (D. Minn. 2015) (citation omitted).  <u>See also</u> <u>Sterling Capital Advisors, Inc. v. Herzog</u>, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998).  There is no evidence that Otoka or Amador was motivated to restructure the Tax Equity Transaction to avoid paying Plaintiff.  First, the record reflects that Otoka expressed a preference that the State Street Defendants make the Installment Payment and repeatedly asked the State Street Defendants to invest more money into the Plant.  Second, it is illogical that Otoka would rather loan and risk $10 million of its own money than obtain $10 million for the State Street Defendants and only have to pay $200,000 of that to Plaintiff.  Third, there is no evidence in the record that Otoka or Amador acted in bad faith with an ulterior motive.

### 4. State Street Defendants

Because there is no viable breach of contract claim against the State Street Defendants, there can be no viable claim for violation of the covenant of good faith and fair dealing.

### E. Count 3: Quantum Meruit (Contract Implied in Fact) (All Defendants)

### 1.    Elements of Quantum Meruit

"Quantum meruit is restitution for the value of a benefit conferred in the absence of a contract under a theory of unjust enrichment." <u>Faricy Law Firm, P.A. v. API, Inc. Asbestos Settlement Trust</u>, 912 N.W.2d 652, 657–58 (Minn. 2018) (citation omitted).  "To prove a claim in quantum meruit, the [plaintiff] must prove "(1) that the services were rendered; (2) under circumstances from which a promise to pay for them should be implied; and (3) their value." <u>Id.</u> at 658 (citation omitted).

### 2.    State Street Defendants

A successful quantum meruit claim requires an implied promise by Defendants to pay Plaintiff.  Dean Street admittedly never discussed the $200,000 fee with State Street or Antrim.  It only received an oral promise for a fee from BVBD long after Berk had already provided the service of introducing the Otoka Defendants to State Street.  There is no reason why State Street or Antrim should have thought that they might be required to satisfy BVBD's obligation for a service already provided to BVBD.  The service was provided to entities other than the State Street Defendants; there is no reason that a promise to pay for

them by the State Street Defendants should be implied simply because BVBD has not paid the fee.

Also, there is no basis to imply additional promises to expand upon the bargain that the parties actually made in sophisticated, integrated written contracts drafted by attorneys. Schedule 3.19 states that Dean Street is entitled to receive its $200,000 fee "[u]nder the terms of a verbal commitment by Buena Vista Biomass Development, LLC," not under the terms of any commitment by the State Street Defendants.

### 3. Otoka Defendants

When "an express contract exists," recovery is not available in quantum meruit if the contract is "a full agreement concerning the details of compensation," and there is no "confusion concerning details of the compensation." <u>Watkins Inc. v. Chilkoot Distrib., Inc.</u>, 719 F.3d 987, 995 (8th Cir. 2013) (citations omitted). Here, the parties agree that an express contract governs the payment of the $200,000 fee – they merely disagree on the contents of that agreement. Thus, quantum meruit does not apply.

### F. Count 4: Unjust Enrichment (Contract Implied in Law) (All Defendants)

### 1. Elements of Unjust Enrichment

> In order to establish a claim for unjust enrichment, the claimant must show that another party knowingly received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit.

Schumacher v. Schumacher, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001). "[T]o ensure that unjust enrichment is not used to reward a bad bargain, Minnesota courts require proof that 'a benefit was conferred unknowingly or unwillingly.'" Holmes v. Torguson, 41 F.3d 1251, 1256 (8th Cir. 1994) (quoting Galante v. Oz, Inc., 379 N.W.2d 723, 726 (Minn. Ct. App. 1986)).

### 2. State Street Defendants

Dean Street's right to the $200,000 payment is the subject of its oral agreement with BVBD. There can be no claim for unjust enrichment when the transaction is governed by an express contract. See, e.g., Loftness Specialized Farm Equipment, Inc. v. Twiestmeyer, 742 F.3d 845, 854-55 (8th Cir. 2014). If, ultimately, Otoka and BVBD are not held liable for breach of that oral contract because a factfinder finds that a condition precedent was not met, Dean Street may not turn to the State Street Defendants "merely because a party has made a bad bargain." Id. at 855 (citation omitted).

Additionally, unjust enrichment does not lie when the benefits were received simply by virtue of membership in a corporation, even when the corporation cannot fulfill its liability. Here, Dean Street asserts that it is not likely to have an adequate contract remedy against the Otoka Defendants, because any judgment against them is likely uncollectible. Its reliance on Langford Tool & Drill Co. v. 401 Group, LLC, for support of its claim is unavailing. No. A14-0507, 2015 WL 134034 (Minn. Ct. App. Jan. 12, 2015). In that case, the appellate court vacated an unjust enrichment judgment against a member of an LLC who had personally promised payment to a contractor working on the LLC's property pursuant to a contract with the LLC but, in the end, the contractor was not paid. Id. at *2. (Here, there is no evidence that the State Street Defendants ever promised to pay Dean Street.) The trial court had concluded that the LLC member had personally benefited from the contractor's work because the member was also a guarantor of the LLC's bank debt and the work had diminished the deficiency owed to the bank after foreclosure and sale of the property. Id. at *4. Also, the member had benefitted as a member of the LLC. Id. The Court of Appeals reversed and held that the LLC member had done nothing illegal or immoral and "unjust enrichment does not lie simply

because someone receives a benefit." Id. at *5. The appellate court further held

that an unjust enrichment claim cannot be based on the benefits that a member

receives from a corporation:

> If the court were to allow unjust enrichment as an equitable claim
> based on benefits a member receives from the corporation, it would
> open the door for unjust-enrichment claims to be brought by a third-
> party creditor against individual members of a corporation when the
> corporation defaults on its obligations, which in essence would
> render the corporate form meaningless.

Id. at *7.

Like in Langford Tool, Antrim only received any benefits as a result of its

contractual bargain, which was a product of its status as a member in Amador.

Allowing an unjust enrichment claim against a member of a corporation when

the corporation defaults on its obligations "would render the corporate form

meaningless." Id. at *7.

Additionally, Dean Street cannot show why it was unjust for the State

Street Defendants to retain the benefit it received: tax credits. Dean Street argues

that it came up with the idea of the Tax Equity Transaction and brought the State

Street Defendants to the negotiations, enabling the State Street Defendants to

receive investment tax credits and other tax deductions from the U.S. Treasury.

However, under the terms of the Tax Equity Transaction, Antrim was entitled to

receive all of the tax benefits under the express written contract and in return for its $25 million investment.  See Ringier Am., Inc. v. Land O'Lakes, Inc., 106 F.3d 825, 829 (8th Cir. 1997) (affirming summary judgment for defendant when defendant "was not unjustly enriched—it received printing services as part of the benefit of its bargain with [a third party], a bargain [the defendant] did not breach").  "Minnesota courts do not apply unjust enrichment to protect a party from the consequences of its bad bargain, even when a third party has received some benefit from the aggrieved party's performance."  Id.

Whether Dean Street was paid by BVBD or not had no impact on what Antrim received in return for its investment in Amador, because all Antrim ever received were the bargained-for tax benefits from the federal government; the rest of the project failed.  (Carnathan Aff., Sealed Ex. I, State Street Defendants' Answers to Strategic Energy's Second Set of Interrogatories No. 15.)  The benefits conferred on the State Street Defendants were tax credits conferred by the United States government, based on federal tax law.  Plaintiff did not confer the tax benefits.  Minnesota unjust enrichment law requires that the benefit be conferred by the plaintiff.  See, e.g., Zinter v. Univ. of Minn., 799 N.W.2d 243, 247 (Minn. Ct. App. 2011).  See also Bethea v. Roizman, No. CIV. 11-254 JBS/JS, 2012 WL

4490759, at *22 (D.N.J. Sept. 27, 2012) ("Further, there is no evidence in the record that the [] Defendants unlawfully received their Section 8 housing subsidies or tax credits.  More importantly, the Plaintiffs did not confer these benefits on the [] Defendants and therefore these benefits cannot serve as a basis for Plaintiffs' unjust enrichment claim.").  Additionally, Plaintiff was not harmed by Defendants' receipt of the tax credits.  In other words, if the State Street Defendants had not received the tax credits from the U.S. government, Plaintiff would not have been in a better position; Plaintiff would be in the same position regardless of whether the U.S. government granted tax credits to the State Street Defendants.  Plaintiff cannot show how allowing Defendants to keep the tax credits works an injustice as to Plaintiff.

### 3. Otoka Defendants

The unjust enrichment claim against the Otoka Defendants fails because there is an applicable enforceable contract.  See Caldas v. Affordable Granite & Stone, Inc., 820 N.W.2d 826, 838 (Minn. 2012) (holding that unjust enrichment "does not apply when there is an enforceable contract that is applicable").

### G. Count 5: Promissory Estoppel (All Defendants)

### 1. Elements of a Promissory Estoppel Claim

Promissory estoppel has three elements:

1. Was there a clear and definite promise?
2. Did the promisor intend to induce reliance, and did such reliance occur?
3. Must the promise be enforced to prevent an injustice?

Ruud v. Great Plains Supply, Inc., 526 N.W.2d 369, 372 (Minn. 1995) (citation omitted).

### 2. State Street Defendants

The promissory estoppel claim against the State Street Defendants must be dismissed because there is no evidence of a clear and definite promise to Dean Street by the State Street Defendants.  See, e.g., Friedenfeld v. Winthrop Res. Corp., No. C4-02-1659, 2003 WL 1908112, at *6 (Minn. Ct. App. Apr. 22, 2003) (affirming grant of summary judgment on promissory estoppel claim when plaintiffs admitted that "no such specific promise was ever made").  Berk admits that the State Street Defendants never made any promise to him to pay Dean Street.  Therefore, summary judgment is appropriate.

### 3. Otoka Defendants

The promissory estoppel claim against the Otoka Defendants fails because Plaintiff and the Otoka Defendants agree that a valid express contract governs the payment of the $200,000.  Promissory estoppel cannot apply when a legally enforceable contract covers the claim.  Reisdorf v. i3, LLC, 129 F. Supp. 3d 751,

771 (D. Minn. 2015). "Promissory estoppel does not provide a means to evade the fact that the claimant failed to establish breach of the contract; rather, it provides an equitable basis for recovery of a promised benefit where the requirements for the formation of an enforceable contract cannot be met." Id.

### H. Count 6: Account Stated (All Defendants)

#### 1. Elements of Account Stated

"An account stated is a manifestation of assent by a debtor and creditor to a stated sum as an accurate computation of an amount due the creditor." Mountain Peaks Fin. Servs., Inc. v. Roth-Steffen, 778 N.W.2d 380, 387 (Minn. Ct. App. 2010) (citation omitted).

> To establish and recover on an account stated, the claimant must show (1) a prior relationship as debtor and creditor, (2) a showing of mutual assent between the parties as to the correct balance of the account, and (3) a promise by the debtor to pay the balance of the account.

Mountain Peaks Fin. Servs., Inc., 778 N.W.2d at 387 (citation omitted). "Merely transmitting an account to a debtor does not establish an account stated." Nelson v. First Nat. Bank Omaha, No. A04-579, 2004 WL 2711032, at *2 (Minn. Ct. App. Nov. 30, 2004).

### 2. Discussion

Here, Berk only presented an invoice for payment to the BVBD and BVBP, sent in care of Otoka. (See Berk Dep. 115-16; Carnathan Aff., Sealed Ex. D.) There was no invoice addressed to Amador. Otoka objected to that invoice. (Dalton Decl., Sealed Ex. 22., Nov. 19, 2013 Email from Muston to Berk.) A putative debtor's objection to a creditor's demand for payment defeats a putative creditor's account stated claim as a matter of law. See Gaalswyk v. King, No. CIV. 10-411 (PJS/JSM), 2011 WL 4091858, at *14 (D. Minn. Aug. 2, 2011), report and recommendation adopted, 2011 WL 4095990 (D. Minn. Sept. 14, 2011).

Berk never presented an invoice for payment to the State Street Defendants. There is no evidence that the State Street Defendants accepted any account as correct or promised to pay it. Thus, the account stated claim fails against all Defendants.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1. The State Street Defendants' Motion for Summary Judgment [Docket No. 90] is **GRANTED** and all claims against Defendants State Street Bank and Trust Company and Antrim Corporation are **DISMISSED WITH PREJUDICE**.

2. The Otoka Defendants' Motion for Summary Judgment [Docket No. 100] is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a. As to Defendant Otoka Energy, LLC, Count 1: Breach of Contract **REMAINS**, and all remaining Counts (2-6) are **DISMISSED WITH PREJUDICE**.

   b. As to Defendant Buena Vista Biomass Development, LLC, Count 1: Breach of Contract **REMAINS**, and all remaining Counts (2-6) are **DISMISSED WITH PREJUDICE**.

   c. All claims against Defendant Buena Vista Biomass Power, LLC are **DISMISSED WITH PREJUDICE**.

   d. As to Defendant Amador Biomass, LLC, Count 1: Breach of Contract **REMAINS**, and all remaining Counts (2-6) are **DISMISSED WITH PREJUDICE**.

Dated:  March 28, 2019          s/ Michael J. Davis
                                Michael J. Davis
                                United States District Court